JANE SHAW *et al.*

*v.*

HENRY SMITHES *et al.*

167  269
178  557

167  269
103a  ¹  44

*Filed at Ottawa June 23, 1897.*

1. LIMITATIONS—*ordinary mode of asserting claim of title.* Using and controlling land as owner is the ordinary mode of asserting a claim of title thereto.

2. SAME—*when bar of twenty year statute is complete.* An uninterrupted possession for over twenty years by one party of part of a tract of land the title to which is in another party, who admits the former's claim of ownership in that part, and allows him to lease the same, collect the rents and pay the taxes assessed in the former's name, will bar the claims of the latter's heirs therein.

3. EVIDENCE—*what not sufficient to show that possession was permissive.* Evidence that an unmarried man had resided with his brother-in-law, that he never paid board but sometimes "did chores and worked," will not establish a filial or *quasi* parental relation between the parties, so as to support the presumption that possession by the former of a portion of a tract of land the title to which was in his brother-in-law was merely permissive.

APPEAL from the Circuit Court of Peoria county; the Hon. T. M. SHAW, Judge, presiding.

This was a bill for partition, filed in the circuit court of Peoria county by Henry Smithes and others, alleging that one James Smithes died intestate on or about December 28, 1891, and that he was at that time the owner and in possession, with title in fee simple, of the east half of the north-west quarter of section 27, in Akron township, in said Peoria county; that he left no widow or descendants, and that complainants and defendants are all the heirs of Smithes capable of inheriting from him, among whom are the children of a sister of the deceased, Hannah, who was married to Thomas Shaw, both now dead, to-wit, Henry Shaw, Jane Shaw, Margaret Shaw and Phœbe Hurst. The bill further alleges that the record title to the said real estate is in the name of the above mentioned Thomas Shaw, but complainants

aver that the land was either conveyed to James Smithes by Thomas Shaw without the deed of conveyance being made matter of record, or else the tract was bought with money furnished Shaw by Smithes, whereby Shaw became trustee for Smithes, and that the record title should be declared to be held in trust for the heirs of Smithes; that Smithes, during his lifetime and for more than twenty years before his death, held the open, notorious, exclusive and adverse possession of the land, claiming to own the same, whereby Smithes, under the Statute of Limitations, became and was the owner in fee. The bill then prayed partition, etc.

The children of Thomas Shaw answered, denying the possession and ownership of Smithes, and alleged that he never had any interest or title in the land and never furnished any money to pay for the same, but that Shaw bought it with his own money, and that he held title and possession until his death, without question or claim by any one; that whatever possession Smithes had was as tenant of Shaw, and that Smithes never claimed to hold adversely to him; that he had always lived with Shaw and had been treated as one of his own children, Shaw giving him shelter, board, washing and other necessary attention without charge or receiving from him any compensation.

The cause was referred to the master, who found that Shaw bought the north-west quarter of section 27 in 1855, and enclosed it with a fence; that in 1861 Smithes entered into possession of the east half of said quarter, and thereafter, by himself or his tenants, continued in the open, notorious, exclusive, continuous and adverse possession of the same, claiming to own it, until his death, and that during all said period he paid the taxes on it, and received the rents, issues and profits of the same, and that during all this time Shaw recognized him as the owner. The circuit court entered a decree in accordance with the master's findings, from which decree Henry

Shaw and the other children of Thomas Shaw have appealed to this court.

W. T. WHITING, for appellants:

Possession and control of land among those occupying parental relations, or *quasi* parental and filial relations, are not to be deemed as adverse, for the reason the possession is presumed to be permissive. Am. & Eng. Ency. of Law, 821, and cases cited; *Davis* v. *Bowmar*, 55 Miss. 671; *Silva* v. *Wimpenney*, 136 Mass. 253; *Evans* v. *Berlocher*, 83 Tex. 612.

A possession originally permissive will never become adverse. *Adams* v. *Guice*, 30 Miss. 397.

The relation of vendor and purchaser is such, that when the latter enters into possession under the contract to purchase, the possession is that of the vendor. *Hale* v. *Gladfelder*, 52 Ill. 91.

One of two parties, where both have equal possession and control of the same tract of land, cannot be in the exclusive adverse possession and control of the land. *Stevens* v. *Leach*, 19 Pa. St. 263.

Where the possession has been consistent with or in submission to the title of the real owner, nothing but a clear, unequivocal and notorious disclaimer and disavowal of the title of such owner will render the possession, however long continued, adverse. *Transportation Co.* v. *Gill*, 111 Ill. 541.

Payment of taxes upon land is not an act of possession. Payment of taxes is only competent evidence to show the extent of the claim to the land, when the actual and exclusive adverse possession of the land has been established by competent and positive evidence. *Reed* v. *Field*, 15 Vt. 672; *Durfee* v. *Railway Co.* 140 Ill. 435; *Brown* v. *Rose*, 47 Iowa, 231; *Thompson* v. *Burhaus*, 79 N. Y. 93.

Adverse possession cannot be made out by inference or implication, for the presumptions are all in favor of the true owner, and the proof to establish it must be

strict, clear, positive and unequivocal. *Trustees of Schools* v. *Schroll,* 120 Ill. 509; *Jackson* v. *Berner,* 48 id. 203; 1 Am. & Eng. Ency. of Law, 228, note 2.

DAN R. SHEEN, and ROBERT H. LOVETT, for appellees:

Twenty years' adverse possession of land, accompanied by payment of taxes under a continuous assertion of ownership hostile to all others, will constitute a bar to a right of entry by any one not within any saving clause of the statute, claiming to have paramount title, whether the claim of the party in possession is rightful or even under a muniment of title. *Turney* v. *Chamberlain,* 15 Ill. 271.

Actual occupation of a tract of land for a period of twenty years, under claim of ownership, is sufficient to bar an action brought by the party holding the title, where the owner of the title is not under disability. *Flaherty* v. *McCormick,* 113 Ill. 549.

Receipt of rent is presumptive evidence of a seizin in fee, and is sufficient till the contrary appear. 3 Phillips on Evidence, 595.

The seizin of the ancestor or devisor may be proved by his receipt of rent or by his actual possession of the premises, either of which is *prima facie* evidence of title in fee. 2 Greenleaf on Evidence, sec. 311; *Benefield* v. *Albert,* 132 Ill. 670; *Gordon* v. *Dickison,* 131 id. 145; *Anderson* v. *McCormick,* 129 id. 316.

Possession may be by tenant as well as by actual occupancy. *Riggs* v. *Girard,* 133 Ill. 488; 3 Phillips on Evidence, 595; *Benefield* v. *Albert,* 132 Ill. 670; 2 Greenleaf on Evidence, 311; *Anderson* v. *McCormick,* 129 Ill. 316; *Gordon* v. *Dickison,* 131 id. 145.

The burden of proof of ownership is upon appellants, as against adverse possession, and such possession gives title that will descend. 1 Am. & Eng. Ency. of Law, 225, and cases cited; *Morse* v. *Seibold,* 147 Ill. 324; *Gosselin* v. *Smith,* 154 id. 74.

Mr. JUSTICE CARTER delivered the opinion of the court:

The only question in this case is, whether James Smithes had adverse possession of the eighty acres in controversy for the statutory period of limitation. There is no controversy as to his actual possession by tenants, but the claim is made that such possession was under Shaw, and not in assertion of an adverse title.

Thomas Shaw bought the whole quarter, part of which is now in dispute, in 1855, and receipts for the taxes paid on it in his name are in the record for the years 1855, 1856 and 1857; then there is no evidence as to who paid the taxes for 1859 or 1860, but receipts for the taxes paid on the east half of the quarter, as made by James Smithes, are in evidence for the years 1861 to 1886, both inclusive; then there is another break in the receipts for the years 1887 to 1890, since which time the receipts are for the whole quarter in the name of Henry Shaw, as executor of Thomas Shaw's estate. While it is true that James Smithes was never married and always lived with his brother-in-law, Thomas Shaw, and never paid for his board, at least so far as the evidence discloses, except that he sometimes "did chores and worked" for Shaw, still, such an arrangement does not raise any presumption of filial or *quasi* parental relations between the parties, so as to support the presumption that any possession that Smithes might have had of any land the record title to which was in Shaw, was a merely permissive possession, as contended by appellants. All the witnesses that knew anything about the facts testified that the east eighty acres of the quarter were known in the neighborhood as the Smithes eighty; that Shaw, when he spoke of it, called it "Jim's eighty" and the other half his eighty; that Smithes leased the land in his own name to tenants and collected the rents, and we do not find any intimation in the evidence that Shaw or any one else ever called in question the fact that it belonged to Smithes. Robert Mayne, a witness for the defendants, said that Shaw told

him that if Smithes ever paid for a part of the land he could have it; that while he was working there, over thirty years ago, Smithes got an interest in the land, and used to call it his. Sarah Smithes, a sister of James Smithes and of Thomas Shaw's wife, testified that twenty-six or twenty-seven years ago, when Shaw was back on a visit in England, he told them that Jim had bought an eighty; that in three years he had paid for it; that he had done better than in England; that he got the money by raising horses and selling them, and paid for it in that way; that Shaw took her on the land after she came to this country and showed her the land, and said "this is Jim's eighty and this (the west eighty) is mine." Daniel Hitchcock testified that Shaw said that he and Smithes bought the quarter together; that thirty-five years ago Smithes claimed to own the east eighty. This eighty was marked on a sectional map of Peoria county, published in 1882, as belonging to Smithes, and again in a gazetteer of the same county, published in 1889, was listed as being his. The house built upon it was insured in his name, and when it burned, in 1887, the insurance money was paid to him. A new house was built and insured in his name. The receipts show that he paid the taxes in his own name. Shaw died January 30, 1890, and his son Henry was named as executor in the will, but filed no inventory until February 26, 1892, after James Smithes had died and he had been appointed his administrator. He filed an inventory of Smithes' estate on the same day, in which he listed one hundred and sixty acres of land in Kansas, for which Smithes had paid $640, and $4180 in notes, but he listed the eighty acres in controversy here in his inventory of his father's estate, more than two years after Thomas Shaw's death. Smithes controlled the land during all the time after he first began paying the taxes on it, and even Henry Shaw paid him two years' rent for it after his father died.

All the terms and expressions used by Shaw and Smithes in reference to this quarter are entirely consistent with the theory that each owned a certain definite portion of the same, and are not consistent with any other theory. They are such as would naturally be used by persons standing in such close relationship and on such intimate terms with each other, owning separate parts of the same larger tract. No reason is disclosed by the evidence, and none can be perceived, why Shaw should allow his brother-in-law such possession and control of the property for such a length of time, and the entire rents and profits, unless it was because the land belonged to him, Smithes; and the fact that when Smithes died he owned one hundred and sixty acres in Kansas, and held over $4000 worth of notes, shows that he was not in indigent circumstances and not dependent on Shaw's bounty. His possession of the land in controversy was not permissive, as a tenant at sufferance, or otherwise, of Shaw, but was such as a purchaser or an owner would have. Though apparently without paper title, he was clothed by Shaw with all the indicia of possession and ownership for nearly thirty years, without any effort to collect any money from him or to take away his appearance of ownership. If the owner permits the occupation of his land for a period of twenty years by a party asserting ownership, he is barred by the statute. (*Weber* v. *Anderson,* 73 Ill. 439.) Smithes claimed the land and spoke of it as his. Every act he did was the act of an owner. Using and controlling property as owner is the ordinary mode of asserting a claim of title. *James* v. *Indianapolis and St. Louis Railroad Co.* 91 Ill. 554.

We think the decree of the circuit court was right, and it will be affirmed.                    *Decree affirmed.*